The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Chapman and the briefs and oral arguments before the Full Commission. The appealing party has shown good ground to reconsider the evidence in this matter. Having reconsidered the evidence of record, the Full Commission reverses the Deputy Commissioners denial of benefits and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
 STIPULATIONS
1. The parties have been properly denominated.
2. An employer-employee relationship existed between defendant-employer and plaintiff.
3. E. I. Dupont De Nemours Company was a self-insured employer with Kemper Risk Management as its servicing agent.
4. At the time of the alleged accident, the parties were subject to and bound by the provisions of the Workers Compensation Act.
5. The parties are properly before the Commission for hearing.
6. The Commission has jurisdiction over the parties and the subject matter.
7. The reporting date of the alleged occupational disease was December 2, 1996.
8. The alleged injury took place in Brunswick County.
9. On the reporting date of the alleged injury, the average weekly wage was $863.76 and the maximum compensation rate of $492.00 was applicable based on the employees salary.
In addition, an 84-page packet of exhibits was stipulated into evidence.
The Pre-Trial Agreement dated June 24, 1998 is incorporated by reference.
 ***********
Based upon all of the competent evidence in the record, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff, who is forty-five years old and who has an associates degree, has been employed by defendant for approximately twenty-six years. As of 1996 plaintiff had worked as a chemical process operator (CPO) at the TPA plant for seventeen years. The plant where he worked manufactured the components of Dacron. His job involved making sure that the chemicals flowed freely through the pipelines in the plant, taking samples of the chemicals at various locations, monitoring the general operation of the machinery and resolving any problems which arose during his shift. From 1990 to 1996 he worked 12-hour shifts in a variable work schedule where he would work three to four days and then have two to four days off of work.
2. The CPO position required field work as well as work in a control room. A CPO who was working in the field would rotate areas of responsibility with others on that shift. They would perform preventive maintenance on the machinery, take samples, make routine patrols in their assigned areas and respond to problems which developed. The problems were often associated with a plugged line, so they would isolate the section of pipe involved by opening and closing valves and then flush the line with steam, an acid solution or a caustic solution in order to clean it. A similar process was used to wash or clean out vessels and other equipment. Once the pipe or equipment had been flushed, the CPO would open and close valves so that the normal working configuration was restored.
3. The valves plaintiff worked with in the field were opened either by turning a wheel or pulling or pushing a lever. The size of the valves varied considerably from one-inch valves to gate valves which were twenty-four inches in diameter. The valves often required the use of two hands to break them loose. Sometimes a valve would require a long rod or more than one person to break loose the valve and then would require anywhere from four to twenty turns to open the valves. In the 1990 to 1996 time period, plaintiff would have to open and close valves from 75 to a 100 times per shift in the field on a routine day and 400 to 500 times on a hectic day of preventative maintenance because of the problems with installing the new chemical processes. The problems could take a few minutes to correct or could take hours. Plaintiff also took samples, which required the opening and closing of six valves for each sample. A normal day during 1990 to 1996 called for from six to thirty samples in the course of the day.
4. Defendants own witness, Richard Love, testified that a workday could require operating close to 200 valves, but that 500 would be excessive. The Full Commission places little weight on this testimony since this witness was not present during the 1990-1996 time period in which there were new processes being implemented and various problems associated with the new processes occurring at the plant.
5. Plaintiff was one of the operators who was trained to work in the control room. The control room contained various equipment which was used to electronically monitor the manufacturing process. There were two systems: the Toshiba system, which was used throughout the time in question, and the Bailey system, which was installed sometime between 1990 and 1996. While working in the control room, plaintiff would at times sit at a computer and do some work on a keyboard, would acknowledge alarms by pressing buttons, and would open and close valves remotely by touching a monitor screen with some force or by pressing a button. Alarms would sound throughout the shift, and he would have to check the various monitors to determine where and what the problem was. Plaintiff testified that he only worked in the control room between 30 minutes and one hour during an eight to twelve hour shift.
6. In addition to his regular duties, plaintiff also did extra work as a fire safety instructor. However, he only taught fire safety a total of four or five days per year. Part of that time involved classroom instruction and part of the time was spent in the field practicing. The fire instruction included demonstrating the coupling of hoses, coupling of air packs, and opening and closing of valves while teaching in the field.
7. During the three years before 1996, plaintiff noticed progressive problems with numbness in his fingers and arms. He mentioned the problems with his left arm to Dr. Johnson in August of 1996. Dr. Johnson ordered an MRI of his cervical spine and then referred him to Dr. Melin, a neurosurgeon. Dr. Melin examined him on September 16, 1996. At that time plaintiff advised that he was having symptoms in both hands but the symptoms had gotten worse on the left side since the previous April so that he had been having numbness in the arm as well as the hand. Plaintiff was also having neck pain. The MRI had revealed an apparent herniated disc at C7-T1 on the right side. Since the MRI findings were on the opposite side as plaintiffs worse symptoms, Dr. Melin ordered additional tests.
8. Nerve testing was positive for bilateral carpal tunnel syndrome, so Dr. Melin recommended surgery. Dr. Melin performed carpal tunnel release surgery on plaintiffs left hand in January 1997 and on the right hand in March 1997. Plaintiff improved following the surgeries and after a period of hand therapy, he was released from medical care. However, plaintiff subsequently returned to Dr. Melin with additional symptoms. Dr. Melin ordered further tests and then concluded that the symptoms plaintiff was then complaining of were probably due to the herniated disc and not to carpal tunnel syndrome, a conclusion with which Dr. Torres, the neurologist who performed the nerve testing, agreed. It did not appear that plaintiff was having problems associated with his carpal tunnel syndrome at that time.
9. Dr. Melin testified and the Full Commission finds as fact that the duties of the plaintiff are consistent with repetitive activities of the hands and would place the plaintiff at an increased risk of developing bilateral carpal tunnel syndrome than the public in general. Dr. Melin testified that plaintiff retained a partial permanent disability rating of ten percent in each hand. Dr. Melin testified and the Full Commission finds as fact that the subsequent pain due to the herniated disk is not work related and not related to the carpal tunnel syndrome.
10. Defendant provided a 20 minute video that was produced by defendant to illustrate the typical workday experienced by the plaintiff. The Full Commission places little weight on the video since a 20 minute video cannot adequately show a typical day experienced by plaintiff back in 1990-1996 when the new plant processes were being installed and integrated into the old program. The video also failed to illustrate the operation of the gate valves which are an integral part of the plaintiffs daily job duties.
11. Plaintiff has proven that he developed an occupational disease which was due to causes and conditions characteristic of and peculiar to his employment with defendant-employer and which excluded all ordinary diseases of life to which the general public was equally exposed.
 ***********
Based upon the foregoing stipulations and findings of fact, the undersigned makes the following:
 CONCLUSIONS OF LAW
1. Plaintiffs bilateral carpal tunnel syndrome is due to causes and conditions characteristic of and peculiar to his employment with defendant-employer, is not an ordinary disease of life to which the general public not so employed is equally exposed, and is, therefore, an occupational disease. N.C. Gen. Stat. 97-53(13).
2. As a result of his contraction of a compensable occupational disease, plaintiff was incapable of earning wages which he had been receiving at the time of the contraction of his occupational disease in the same or in any other employment for the period from December 2, 1996 through and including April 9, 1997. Plaintiff is entitled to temporary total disability compensation at the rate of $492.00 per week for the period from December 2, 1996 through and including April 9, 1997, in which he was absent from work due to his bilateral carpal tunnel syndrome. N.C. Gen. Stat. 97-29.
3. As a direct and proximate result of plaintiffs compensable occupational disease, plaintiff retains a 10% permanent partial disability to each hand. Plaintiff is entitled to compensation at the rate of $492.00 per week for a period of 40 weeks for his 10% permanent partial disability of both hands. N.C. Gen. Stat. 97-31(12).
4. Plaintiff is entitled to payment of all medical expenses incurred as a result of his contraction of bilateral carpal tunnel syndrome in his employment with defendant-employer which were reasonably required to effect a cure, give relief, or tend to lessen plaintiffs period of disability. N.C. Gen. Stat. 97-25.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendant shall pay compensation to plaintiff at the rate of $492.00 per week from December 2, 1996 through April 9, 1997 on account of his temporary total disability. This compensation has accrued and shall be paid in a lump sum subject to an attorneys fee approved below.
2. Defendant shall pay to plaintiff, for his 10% permanent partial disability of each hand, 40 weeks of compensation at the rate of $492.00 per week. This compensation has accrued and shall be paid in a lump sum, subject to a reasonable attorneys fee approved below.
3. Defendant shall pay all medical expenses incurred by plaintiff as a result of his contraction of bilateral carpal tunnel syndrome which were reasonably required to effect a cure, give relief, or tend to lessen plaintiffs period of disability.
4. A reasonable attorneys fee of 25% of the compensation due under Paragraphs 1 and 2 of this Award is approved for plaintiffs counsel and shall be deducted from the sum due plaintiff and paid directly to plaintiffs counsel.
5. Defendant shall bear the costs.
This 18th day of August 2000.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
/S_______________ CHRISTOPHER SCOTT COMMISSIONER
/S_______________ DIANNE C. SELLERS COMMISSIONER